IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RICHARD BERG, EUGENIA ALVAREZ, and MELANIE CLOGHESSY, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No.     10 C 5334 |
| | ) ) | Judge Blanche M. Manning |
| TEAMSTERS JOINT COUNCIL 25, and INTERNATIONAL BROTHERHOOD OF TEAMSTERS | ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

The instant dispute stems from power struggles by opposing groups within Teamsters Local 743 ("Local 743"). The plaintiffs, two of whom are suspended members of Local 743, and one who is currently a member in good standing, brought suit against Teamsters Joint Council 25 and International Brotherhood of Teamsters ("IBT"), alleging that two of the plaintiffs, Richard Berg and Eugenia Alvarez, were improperly suspended from membership and removed as officers of Local 743. The plaintiffs seek injunctive relief in the form of an order reinstating Berg and Alvarez to membership and office. For the reasons stated below, the plaintiffs' motion for a preliminary injunction is denied.

**A.    Facts**[1]

The court sets forth in this section the basic facts surrounding the instant dispute. Other facts will be discussed later in this order as they become relevant to the court's analysis of the plaintiffs' claims. Defendant IBT is an international labor organization within the meaning of 29 U.S.C. § 402(i). Defendant Teamsters Joint Council 25 ("JC 25") is a subordinate body of IBT, is headquartered in Park Ridge, Illinois, and is a "labor organization" within the meaning of 29 U.S.C. § 402(i). JC 25 is an umbrella organization for all of the Teamsters local unions in the Chicago metropolitan area and Northwest Indiana. Local 743 is headquartered in Chicago and represents employees of nursing homes and hospitals as well as warehouses and manufacturing plants. John Coli is not named as a defendant but is President of JC 25 and is Central Region Vice-president for the IBT. Coli acted as the defendants' representative at the preliminary

---

[1]These facts were taken primarily from the parties' recitation of the facts in their post-hearing briefs. The court has also included some facts from the complaint which appear to be undisputed.

injunction hearing and testified at the hearing on behalf of the defendants. The IBT is governed by its constitution and bylaws. Local 743 and JC 25 are each governed by their own set of bylaws as well as the IBT constitution and bylaws.

Plaintiffs Berg and Alvarez were members of Local 743 in Chicago until they were removed from office as president and secretary-treasurer, respectively, and suspended from membership in May 2010, as detailed more fully below. The third plaintiff, Melanie Cloghessy, is a rank and file member in good standing of Local 743 who voted for Berg and Alvarez and also seeks their reinstatement to membership and office.

Berg and Alvarez became the Chicago leaders of Teamsters for a Democratic Union ("TDU"), which "is a reform caucus of rank-and-file Teamster members." Complaint at ¶ 11. Berg opposed Local 743's incumbent administration, which supported IBT President Jim Hoffa, in union elections in 1998, 2001, 2004, and 2007. Running under the New Leadership slate, Berg and Alvarez won the Local 743's 2007 election, which the Department of Labor supervised due to fraud in the earlier 2004 election. Specifically, after the 2004 election, the Department of Labor filed suit against Local 743 under the LMRDA alleging election fraud. Pursuant to a settlement, the regularly scheduled 2007 election was conducted under the supervision of the Secretary of Labor. Plaintiffs' Exh. EE. In addition, several members of Local 743, including Robert Walston and Richard Lopez, were indicted for crimes related to the 2004 election fraud. Plaintiffs' Exh. GG. Hoffa did not impose a trusteeship or appoint a personal representative to oversee Local 743 after the Department of Labor filed suit and alleged fraud in the 2004 election.

Berg and Alvarez began their terms as president and secretary-treasurer of 743, respectively, in January 2008. Berg testified that by 2007, he and Alvarez were the only Teamster leaders in Chicago who were openly active in TDU, though other members elected to Local 743 office with Berg and Alvarez supported the TDU platform. At the hearing, the parties detailed the historically contentious relationship between TDU supporters and Hoffa supporters. For example, delegates at IBT conventions preceding union elections often wear buttons or t-shirts in support of their platforms, which include statements like "TDU Sucks" and "Dump Hoffa." TDU supporters sold t-shirts with the "Dump Hoffa" slogan outside the IBT convention's main entrance while IBT secretary-treasurer Thomas Keegel has ended at least one speech with the statement "TDU sucks." Berg also testified that Hoffa supporters chant "TDU Sucks" on the convention floor and did not deny that the chant "Dump Hoffa" was used by TDU supporters.

Berg also testified that at the 2006 IBT convention at which he was nominated to run for Central Region Vice-president of the IBT, Hoffa supporter and then-Local 743 officer Richard Lopez punched Berg in the mouth. Berg filed an election protest and Lopez was found guilty of striking Berg in the face. No one else was charged or convicted of participating in that event. Testimony was also elicited regarding campaign literature distributed by both Hoffa supporters and TDU supporters critical of the opposing platform. For example, Berg's "New Leadership" slate distributed a flyer in 2000 stating in part that:

> The stories of betrayal and sellout in Local 743 are many. You have your own story or stories. We have ours as well. A rigged vote, a rotten contract, blatant corruption, double dealing behind our backs, favoritism and much more.
>
> Soon, we the members of Local 743, along with Teamsters all over the country, will have the chance to replace corrupt old guard union officials with new style fighters who will stand with the rank and file. It is time to get rid of Chester Glanton, Junior Hoffa, Philip John, Richard Lopez, Tom Vitali, Louis Sullivan and others who consistently sit on the wrong side of the table.

Plaintiff's Hearing Exh. 16-3. Berg also had a website in 2004 associated with his New Leadership slate, which criticized Hoffa. In addition, Berg and the slate under which he was running, the Leedham slate, distributed campaign literature in 2006 critical of Hoffa and accusing him and his supporters of corruption, broken promises and a failed record. *See* Plaintiffs' Hearing Exh. 16, pp. 22-25. After Berg was elected president of Local 743 in 2007, he was interviewed by Chicago Public Radio, which identified him as "the city's leading opponent of International Teamsters President James P. Hoffa." Plaintiff's Exh. R. In addition, Alvarez testified that she and Berg were confronted in 2009 by Brian Rainville, JC 25's executive director about an article in the *Convoy Dispatch*, a TDU publication, regarding the trial of the Local 743 officials with respect to the 2004 election fraud.

On August 28, 2009, a majority of Local 743's executive board filed internal union charges against Berg and Alvarez. The charging members were Larry Davis, Betty Richardson, Chantell Harlin and Fernando Garcia. All of these members except Betty Richardson were Berg and Alvarez's political allies, had run with Berg and Alvarz on the New Leadership slate, and were installed with them in January 2008. There were 10 charges filed against Berg and 6 charges filed against Alvaerz. The plaintiffs believe these charges were unfounded and politically motivated. The first charge against Berg is the one primarily at issue and thus the court quotes it:

> 1. Violated Section 14(A)(2) of Teamsters Local 743 Bylaws and all related Sections of Local 743 Bylaws and the IBT Constitution
>
> Paid out $21,000, 4 months of Health Benefits and agreed not to contest unemployment benefits for a Business Agent (Antonio Caldera). A Severance and General Release Agreement was signed by the Business Agent and President Berg. Attached is a copy [of] the signed check, deduction and adjustment worksheet, signed copy of the Severance and General Release Agreement and a copy of the Local 743 Check Summary Report for February 2009. **These payouts were all done without the approval of the Executive Board**.

Plaintiffs' Exh. S (emphasis in original). The first charge against Alvarez was very similar but

Page 3

charged her with signing the check to Caldera.[2]

The record reflects the following series of events with respect to the severance payment to Tony Caldera, a member of Local 743, which is at the core of the first charge against Berg and Alvarez. Caldera was hired in January 2008 at an annual salary of $42,000 to $44,000, but was later terminated for failure to perform his duties. At a February 2, 2009, Local 743 board meeting, Berg told the board that Caldera threatened to sue the union for $90,000 but Berg stated he was hoping to pay Caldera between $20,000 and $25,000 to settle the matter. Berg's position is that, as he interpreted the bylaws, he had the power to enter into the severance agreement without board approval. *See* Plaintiffs' Reply in Support of Their Post-Hearing Memorandum at 2-3, Dkt. 47 ("Berg reasonably interpreted the silence of the bylaws on the subject of severance agreements as empowering him to enter into severance agreements with employees he was solely empowered to hire and fire, including organizers. This undoubtedly was not the only reasonable interpretation, but that doesn't mean that it was unreasonable. It certainly does not mean that it was *misconduct*.")(emphasis in original). Berg contends that even though he did not need the board's approval under his interpretation of the bylaws, he asked for a motion to approve the severance agreement "to create collectivity and to get our group to work together." Tr. at 100. However, Berg apparently dropped the issue after there were objections to the amount and discussion by the board as to why they had not been better informed about the problems with Caldera. No motion to approve the severance agreement was ever made at the February or any board meeting.

On February 18, 2009, Berg signed the severance agreement, which paid Caldera $21,000, plus four months health insurance and included a promise that Local 743 would not contest Caldera's unemployment claim. At the March 2, 2009, board meeting Berg informed the board that he had reached an agreement with Caldera and at the April 6 meeting, the board approved a routine motion to "pay the bills." One of the checks reported at the April 6 meeting was the $21,000 check to Caldera.

On September 5, 2009, Berg, who acknowledges that he was "probably aware" of the August 28, 2009, charges against him at that time, started a phone poll to approve the severance agreement with Caldera. Local 743 Bylaw 14(f) authorizes the president to conduct a "phone poll" between board meetings. A majority vote in the phone poll constitutes formal action by the board; however, any action must be confirmed at the next "formal session" of the board.
According to Berg, he conducted the phone poll on the advice of the Local 743 attorney and John Coli, president of JC 25. Berg drafted the phone poll which states in part that:

---

[2]After a hearing JC 25 found that Berg and Caldera were guilty of the first charge and that Berg was also guilty of the second charge related to Berg's refusal to allow certain Local 743 members to pay dues. On appeal, the General Executive Board of the IBT dismissed the second charge against Berg. Accordingly, the court will only discuss the first charge in this order.

> President Berg previously reported to the Executive Board that Tony Caldera had agreed to resign his position as Organizer with Local 743 and settle all outstanding grievances and/or claims on the Local in return Local 743 would pay him $21,000. President Berg said that he considered this a Labor Relations issue. This was not challenged by the Executive Board.
>
> President Berg has discussed the issue with legal council [sic] which said this was acceptable as per our bylaws. Council [sic] further said he would recommend a vote to approve as well. Therefore:
>
> Resolve, to accept Tony Caldera's resignation and signed documents to avoid any potential litigation and resolve the matter completely. In return Tony Caldera would receive $21,000.

IBT Hearing Exh. 3, attachment B.

Berg testified that the phone poll was conducted between September 5 to 8, 2009, and that he personally polled himself, Alvarez, and Chantell Harlin, who all voted yes. Harlin, however, one of the individuals who filed the charges against Berg and Alvarez, denies that she told Berg yes. Tr. at 482. Byron Richardson voted yes while the others voted no; thus, with a "yes" vote listed for Harlin, the phone poll passed by a majority of four to three. The phone poll was never "confirmed" at a board meeting as the bylaws require.

The charges against Berg and Alvarez were filed with JC 25 as required under the Local 743 bylaws and the IBT Constitution because they involved a majority of Local 743's Executive Board. Berg was formally served with the charges by letter dated September 9, 2009, by the JC 25 Secretary Treasurer. JC 25 Exh. Binder 2, Joint Council Tab, Tab 1, p. 1. The letter informed Berg and Alvarez and notified them of the hearing date, time and place. The letter also instructed Berg and Alvarez that "[e]ach party may be assisted in his/her presentation only by a member in good standing of his Local, who is not going to be a witness." *Id*. Berg wrote a letter to the JC 25 on September 15, 2009, in which he acknowledged receipt of the charges and asserted his preliminary objections to the charges. JC 25 Exh. Binder 2, Joint Council Tab, Tab 1, pp. 2-3. In the letter, he stated that "[Charges] 1 and 2 deal with matters that have been approved by the Local 743 Executive Board at the September 2009 meeting and in a separate phone poll." *Id*. At the hearing Berg testified that he meant that Charge 1 concerning the $21,000 payment to Caldera was approved in a phone poll and the subject of the second charge was approved in a September 2009 board meeting. Although Berg contended in the letter that the payment to Caldera was approved by a phone poll, he never presented any evidence regarding the phone poll or its ratification at the hearing on the charges before JC 25, discussed below.

A hearing was held before a JC 25 panel over two days in September and October 2009. Berg and Alvarez were represented by other Local 743 members at the hearing and were allowed to examine witnesses and enter exhibits. Berg asserts that he had the authority to enter into the

Page 5

severance agreement, and that he informed Local 743's board of the payment and the agreement but that the board did not object or overrule his decision. Berg did not raise the phone poll defense as to Charge #1 at the hearing.

After the hearing concluded, the panel reviewed the evidence with the JC 25 attorney and came up with its recommendation to the JC 25 Executive Board. In its consideration of the charges and possible discipline to impose, the JC 25 reviewed other disciplinary decisions of the IBT and the Independent Review Board ("IRB"). According to Coli, "the Independent Review Board is the disciplinary body that has been created by the consent decree between the United States Government and International Brotherhood of Teamsters from te 1988 RICO case, and they retain jurisdiction independent of the [IBT] General Executive Board with the same authority as the [IBT] executive board to discipline individuals." Tr. at 384. After it had received the panel's recommendation, the JC 25 Executive Board voted unanimously to approve the recommendation. Coli did not vote because, as president of JC 25, he votes only to break a tie.

In January 2010, JC 25 issued its decision finding Berg guilty of entering into the severance agreement with Caldera without board approval and, as to Alvarez, signing the severance check knowing that it had not been board-approved. The JC 25 also found Berg guilty of refusing to allow certain Local 743 members pay dues. The JC 25 ordered Berg and Alvarez to be immediately removed from office and all compensated union employment for a period of three years. Berg also was suspended from union membership for five years while Alvarez was suspended from membership for three years.

Berg and Alvarez appealed to the IBT General Executive Board ("GEB"). They also requested a stay of the JC 25's decision pending appeal, which Hoffa granted in his discretion. The stay allowed Berg and Alvarez to remain in office pending resolution of the appeal. Hoffa reviewed the appeal first and recommended to the GEB that the second charge against Berg relating to his refusal to allow certain union members to pay dues be dismissed. Hoffa also recommended that the first charge regarding the $21,000 payment to Caldera be upheld but that the penalties against Berg and Alvarez be reduced. Specifically, Hoffa recommended that to the GEB that Berg's three-year suspension from office and his five-year suspension from membership each be reduced to two years. Hoffa further recommended that Alvarez's two-year suspensions from office and membership be reduced to one year.

The 30-member GEB voted unanimously to adopt Hoffa's recommendation and issued a decision on May 10, 2010, voiding the Joint Council's decision regarding the charges against Berg regarding his refusal to allow certain members to pay dues. It affirmed the ruling on the severance agreement finding that Berg knew he needed Executive Board approval for the payment to Caldera but failed to obtain it. It also concluded that "no provision of the Bylaws can be interpreted as granting the President unilateral discretion to expend $21,000 of Local Union funds." Plaintiffs' Exh. CC at 4. It further stated that the "power to hire and fire does not include authority to issue severance checks" and that "if the severance agreement is viewed as the settlement of potential litigation, it places the issue squarely within the Executive Board's

Page 6

authority under Section 14(A)(5) of the Bylaws" which authorizes the board to resolve legal proceedings. The GEB also rejected Berg's assertion that the payment was approved under the routine motion made at every board meeting to "pay all bills" because the "payment at issue is not a 'bill.'" *Id*. at 5. Finally, the GEB noted that while Berg mentioned the phone poll in his pre-hearing letter to JC 25, he failed to present evidence of it at the hearing before JC 25 and that even if a phone poll had been conducted, it was undisputed that the poll was never ratified. *Id*. at 4. The GEB reduced the plaintiffs' penalties as stated above.

According to the plaintiffs, "[u]nder the IBT constitution, a Teamster suspended for a single day is ineligible to run for union office until he or she has re-established continuous membership in good standing for a period of two years." Complaint at ¶ 163. Thus, according to the plaintiffs, due to the terms of local union office, they are effectively disqualified from holding local union office for the next two terms or six years. Complaint at ¶¶ 121, 124. Berg and Alvarez continue to be actively involved in TDU. The plaintiffs allege that injunctive relief is necessary in order to restore Berg and Alvarez to membership and office prior to the next nominations meeting for the next election. They move under the Labor-Management Reporting Disclosure Act of 1959, 29 U.S.C. §§ 401 *et seq*, ("LMRDA") for a preliminary injunction.[3]

The plaintiffs have alleged the following counts: Count I--Retaliation for Political Opposition in violation of the LMRDA § 101(a)(2), 29 U.S.C. § 411(a)(2); Count II–Violation of Equal Voting Rights under LMRDA § 101(a)(1), 29 U.S.C. § 411(a)(1); Count III–Due Process violations; Count IV[4]–Retaliation for Exercising LMRDA Rights in violation of LMRDA § 609, 29 U.S.C. § 529; Count V–Breach of Union Constitution; and Count VI–Breach of the Local Union Bylaws.

Regarding the witnesses' credibility at the hearing, the court did not find Berg or Alvarez particularly believable while it found the defendant's primary witness, John Coli, to be straightforward and credible.

**B.     Analysis**

Prior to beginning its analysis of the plaintiffs' claims, the court notes the plaintiffs' statement in their opening post-hearing memorandum that "[g]iven the circumstances under which this brief is being submitted, it is primarily a barebones enumeration of relevant evidence, with citations to the record. Plaintiffs ask the Court to refer to their Motion, [initial] Brief [in support of their motion for a TRO and preliminary injunction], and the declarations of Richard

---

[3]The court entered a temporary restraining order on September 9, 2010, and ordered the scheduled September 13, 2010, nominations meeting be postponed until September 23, 2010. The parties then agreed to extend the temporary restraining order until October 15, 2010.

[4]Count IV is incorrectly identified as Count V in the complaint. The court will refer to this count as Count IV.

Berg, in conjunction with this memorandum." Plaintiffs' Post-Hearing Memorandum at 1, Dkt. #36-1. This approach is inadequate for several reasons.

First, "it is not the obligation of this Court to . . . construct the legal arguments available to parties." *United States v. Alden*, 527 F.3d 653, 664 (7th Cir. 2008). According to the plaintiffs, the short timeframe under which the case must be decided precluded them from fully briefing the legal issues. But such an approach leaves the court with little guidance from the plaintiffs as to why they believe they are entitled to injunctive relief. By not applying the facts to the law in its post-hearing brief, the plaintiffs have essentially left it to the court to ascertain which evidence from the hearing supports which of their claims and why. Second, by incorporating their prior briefs, the plaintiffs have circumvented the page limit requirements of the local rules. Finally, referring to the plaintiffs' pre-hearing briefs provides no assistance as those briefs also fail to provide the proper legal framework that the court must follow in analyzing the plaintiffs' claims.

The plaintiffs' failure to guide the court through the analysis is particularly surprising given the fact that the current "emergency" is of the plaintiffs' own making. Instead of seeking injunctive relief months ago when they first learned of the IBT decision upholding certain aspects of the discipline against them, the plaintiffs waited to file suit only three weeks before the nominations meeting for the next election. The court has attempted to address the plaintiffs' claims to the best of its ability given the time constraints and the method by which the plaintiffs have presented their case. Given the nature of the plaintiffs' filings, to the extent that the plaintiffs may contend that the court characterized their argument incorrectly, they have forfeited any such claim.

### A. Injunctive Relief

As noted by the Seventh Circuit, "[t]o justify a preliminary injunction, the plaintiffs must show that they are likely to succeed on the merits, that they are likely to suffer irreparable harm without the injunction, that the harm they would suffer is greater than the harm that the preliminary injunction would inflict on the defendants, and that the injunction is in the public interest." *Judge v. Quinn*, 612 F.3d 537, 546 (7th Cir. 2010) (citations omitted). "These considerations are interdependent: the greater the likelihood of success on the merits, the less net harm the injunction must prevent in order for preliminary relief to be warranted." *Id.* (citation omitted).

### B. Counts I (LMRDA § 101(a)(2)) and II (LMRDA § 101(a)(1)

"One of the principal purposes of the LMRDA is to 'afford necessary protection of the rights and interests of employees and the public generally as they relate to the activities of labor organizations.'" *Reich v. Local 399, Intern. Broth. of Elec. Workers, AFL-CIO, CLC*, 3 F.3d 184, 189 (7th Cir. 1993)(*citing* 29 U.S.C. § 401(b)). The Supreme Court has described the history of the LMRDA as follows:

> The Labor-Management Reporting and Disclosure Act of 1959 was the product of congressional concern with widespread abuses of power by union leadership. The relevant provisions of the Act had a history tracing back more than two decades in the evolution of the statutes relating to labor unions. Tensions between union leaders and the rank-and-file members and allegations of union wrongdoing led to extended congressional inquiry. As originally introduced, the legislation focused on disclosure requirements and the regulation of union trusteeships and elections. However, various amendments were adopted, all aimed at enlarged protection for members of unions paralleling certain rights guaranteed by the Federal Constitution; not surprisingly, these amendments-ultimately enacted as Title I of the Act, 29 U.S.C. §§ 411-415-were introduced under the title of "Bill of Rights of Members of Labor Organizations." The amendments placed emphasis on the rights of union members to freedom of expression without fear of sanctions by the union, which in many instances could mean loss of union membership and in turn loss of livelihood. Such protection was necessary to further the Act's primary objective of ensuring that unions would be democratically governed and responsive to the will of their memberships. See 105 Cong. Rec. 6471-6472, 6476, 15530 (1959), 2 Leg. Hist. 1098-1099, 1103, 1566.

*Finnegan v. Leu*, 456 U.S. 431, 436 (1982)(footnote omitted).

"[T]he core purpose of § 101(a)(2) is to protect free speech and assembly rights because these are considered "vital to the independence of the membership and the effective and fair operation of the union as the representative." *Reed v. United Transp. Union*, 488 U.S. 319, 325 (1989). Specifically, § 101(a)(2) states that:

> (2) Freedom of speech and assembly
>
> Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: Provided, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

Further, § 102 provides in relevant part that "[a]ny person whose rights secured by the provisions of this title have been infringed by any violation of this title may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate."

1.  *Likelihood of success on the merits*

a. <u>Retaliation</u>

"To establish retaliation in violation of Title I, [the plaintiffs] must demonstrate that: (1) their conduct was an exercise of free speech as defined and protected by Title I of the LMRDA; (2) the defendants took actions against them in substantial part because of this exercise of Title I rights; and (3) they were damaged and suffered an injury as a proximate result of the defendants' actions." *Kauffman v. International Broth. of Elec. Workers, Local Union No. 461*, 124 F. Supp.2d 1127, 1131 (N.D. Ill. 2000)(citation omitted). In order for the plaintiffs to succeed on their retaliation claim under the LMRDA, they must show that the exercise of their free speech rights was the "but-for" cause for having been disciplined by the defendants. *Serafinn v. Local 722, International Brotherhood of Teamsters, Chauffeurs*, 597 F.3d 908, 915 (7th Cir. 2010). The plaintiffs may show retaliation under either the direct or indirect methods. *Id*. at 918. "Under the direct method, [the plaintiffs] need[] to show either direct evidence or a 'convincing mosaic of circumstantial evidence' that the joint council charged [them] with violating the . . . rules because [they] exercised [their] right to free speech." *Id*. (citation omitted). "Under the indirect method, [the plaintiffs] need[] to show at least that [they were] treated differently from similarly situated union members who did not exercise their right to free speech." *Id*. (citation omitted).

The plaintiffs appear to be proceeding under the indirect method and the court addresses the legal argument as framed by the plaintiffs. They contend without authority that "[p]ermissible indirect evidence of unlawful purpose is evidence of pretext. Pretext may be shown by disparate treatment." Reply at 6, Dkt. 47. According to the plaintiffs, the fact that they were disciplined more harshly than others who have had charges brought against them demonstrates that they were treated differently based on the fact that they were members of the opposition group TDU.

<u>Glanton</u>. They first refer to Chester Glanton, a former president of Local 743 and IBT vice-president who was associated with the Hoffa administration. Charges were brought against Glanton in August 1999 by Robert Walston, secretary-treasurer of Local 743 at that time. The charges alleged that Glanton had: (1) twice authorized payments of health insurance premiums for former Local 743 employees after a majority of the members of the Local 743 Executive Board had voted to discontinue such payments; (2) adopted a more costly health insurance plan for Local 743 employees without Local 743 board authorization; (3) granted salary increases to Local 743 union employees without board approval; and (4) transferred funds from the general treasury of Local 743 to Local 743's PAC fund without board approval. The charges against Glanton were tried directly before the IBT General Executive Board ("GEB") because he was an IBT union officer. *See* JC 25 Exh. 4, art. XIX, § 5(a) at p. 144-45. The GEB panel conducted a hearing in 2000 and recommended to the GEB that the all charges be dismissed, which they were.

The plaintiffs contend that the fact that the serious charges against Glanton, an IBT officer aligned with the Hoffa administration, were dismissed while the charge against them regarding the payment to Caldera was not, is evidence of disparate treatment. They point primarily to an internal investigation and report of the charges, Plaintiff's hearing Exh. 7, that was conducted by

Page 10

John Farrell, of Katten Muchin & Zavis.[5] According to the report, Farrell was retained by Local 743 to investigate whether Glanton had breached his fiduciary duties. In his report, Farrell concluded that Glanton had "engaged in a repeated pattern of disregard for the Bylaws of the Local as well as for the past resolutions of the Executive Board" that resulted in an "abuse of his position." Plaintiffs' Exh. 7 at 5. The plaintiffs also point to a May 17, 1999, "memo to file" written by Local 743's attorney, Marvin Gittler, which also was apparently before the GEB when it made its decision to dismiss the charges. *See* Plaintiff's hearing Exh. 8. In the memo, Gittler discusses the charge that Glanton transferred funds from the union's general account to its PAC account to pay for a member's trip to South Africa to meet Nelson Mandela. Gittler "theorizes" that if the PAC funds were returned to the general fund and a "personal reimbursement" were made to the PAC fund, "there might be an impact on whatever remedy was determined to be appropriate." *Id.* at p. 3.

According to the plaintiffs, the fact that the more serious charges levied against Glanton were dismissed while the less serious charge against the plaintiffs was not makes a persuasive case for a finding of disparate impact. The plaintiffs state that the charges against Glanton alleged intentional and knowing violations of clear and explicit approval requirements of the bylaws (unlike, they say, the instant case) and yet he, a Hoffa follower, was absolved of any liability. The plaintiffs further assert that the case against them was relatively weak because they had made a good-faith attempt to interpret the bylaws in order to determine whether Local 743 board approval was necessary prior to making the payment to Caldera and that a "fair and neutral factfinder would have recognized the [plaintiffs'] good faith effort to resolve a difficult problem." Reply at 10, Dkt. # 47.

However, the plaintiffs have not demonstrated that they were similarly situated to Glanton. Here, the charges and the trials took place ten years apart, and as Coli testified, approximately 80% of the GEB members have turned over since 2006. Thus, the individuals who decided the case against Glanton are not the same as those who decided to uphold the one charge against Berg and Alvarez. Moreover, the plaintiffs' position would require this court to reweigh all of the evidence (not just the evidence favorable to the plaintiffs' position) that was presented to the GEB in the Glanton case and essentially act as an appellate panel to ascertain whether the GEB's decision was justified.

IRB Decisions. During the hearing, Coli, president of JC 25, testified that JC 25 relied upon seven IRB decisions in order to ascertain the appropriate discipline to impose on the plaintiffs. Coli testified that "the joint council was looking to the IRB decisions for guidance in crafting its penalty" because "we would like the IRB and the consent decree to be over, and we would like to be able to discipline ourselves" so "we've got to demonstrate . . . that we're willing

---

[5]The court allowed the report to be admitted during the hearing over the defendants' objection because the plaintiffs argued that they sought its admission not for the truth of the matters asserted therein but to show what was in front of the GEB when it decided to dismiss the charges against Glanton.

to take corruption and financial management seriously." Tr. at 390. According to Coli, the IRB decisions were one of several factors the JC 25 panel considered in meting out discipline to the plaintiffs. The plaintiffs contend that had JC 25 actually relied upon these decisions, the plaintiffs would not have been as harshly disciplined as they were. As with Glanton, the plaintiffs' position is that the misconduct involved in the IRB decisions involves "serious, intentional wrongdoing" in contrast to the plaintiffs' less serious and well-intentioned conduct.

As an initial matter, the court notes that the relevance of the discipline imposed by JC 25 is questionable given that the plaintiffs had an avenue of appeal to the GEB, which the plaintiffs pursued. The discipline imposed by JC 25 was short-lived and indeed was stayed pending their appeal. On appeal, the GEB reduced Berg's suspension from five years to two years for Berg and from three years to one year for Alvarez.

In any event, the plaintiffs specifically refer to the IRB decision involving union members Clair (who later settled with the IBT), Falzone and Marcatante, who were charged with, among other things, causing Local 726 to enter into prohibited pension fund transactions and improperly administering the local's pension fund. *See* JC 25 hearing Exh. 19. The IBT GEB panel found that Falzone and Marcatante had engaged in clear breaches of their fiduciary duties and recommended that they be removed from their positions as union officers for three years, but, the plaintiffs note, it was not recommended that they be excluded from membership despite the serious nature of their violations. According to the plaintiffs, "[i]f JC 25 actually relied upon this decision, it surely would not have suspended plaintiffs from membership." Plaintiffs' Post-Hearing Memorandum at 14, Dkt. #36.[6] However, the plaintiffs have failed to demonstrate, as with Glanton, that they were similarly situated to Falzone and Marcatante, who paid restitution.

Role of Coli and Hoffa. The plaintiffs also claim that Hoffa and Coli "heavily influenced the vote." Again, it is not entirely clear how this assertion supports the plaintiffs' retaliation

---

[6]The court again notes that the plaintiffs again fail to properly cite to the record in support of their position on this issue. For instance, the plaintiffs argue that:

> JC 25 punished plaintiffs more harshly than every one of the accused officers in these cases, except Lark, who engaged in the despicable practice of coercing kickbacks from members as a condition of getting work from the Union's hiring hall, conduct that not only defiled the union, but also subjected it to potentially enormous liability to the wronged members, on NLRB proceedings. Of the cases proffered, only Lark and embezzlers were suspended from membership.

Plaintiffs' Post-Hearing Memorandum at 23 (emphasis in original). The plaintiffs, however, fail to identify who Lark is or cite to the relevant part of the record. "Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). Thus, the court will not consider this reference.

claim, at least as the plaintiffs have framed it. Indeed, this argument appears aimed at the plaintiffs' allegation that they did not receive due process. In any event, the plaintiffs point to the fact that while Coli, a Hoffa supporter, did not vote with respect to the discipline imposed by JC 25, he acknowledges that he participated in the discussion regarding JC 25's decision as to the charges against the plaintiffs. Again, however, as noted above, the JC 25's decision was short-lived given the plaintiffs' appeal to the GEB. More important, the plaintiffs point to no evidence that Coli directed the result or ordered the discipline imposed–only that he "participated" in the discussion prior to the vote.

Hoffa also did not participate in the GEB vote, though he did draft a recommendation to the GEB, which it adopted in full. The plaintiffs appear to be contending that Hoffa must have disciplined them more harshly because of the history between TDU and Hoffa's platform. However, the plaintiffs again fail to point to any specific evidence that Hoffa was biased against them. *Frye v. United Steelworkers of America,* 767 F.2d 1216, 1225 (7th Cir. 1985), superseded by statute on other grounds, *Meyer v. Rigdon,* 36 F.3d 1375, 1380 (7th Cir. 1994) ("While a history of conflict and animosity between a member of a union and its governing body may set the stage for harsh or improper treatment of that member, charges that bias undermined the fairness of a disciplinary proceeding must be supported by specific factual allegations from which the operation of bias can be inferred.").

Appointment of Personal Representative. As additional evidence that they were being discipline solely for their views, the plaintiffs point to the fact Hoffa appointed a personal representative, Brian Rainville, to Local 743, pursuant to the IBT Constitution, after Berg and Alvarez were found liable of the internal union charges by JC 25 and were removed from membership and office, but remained in office pursuant to Hoffa's stay. The plaintiffs assert that Rainville's placement in Local 743 as Hoffa's personal representative was "tanatmount to the placement of a political spy into the midst of the opposition." Plaintiff's Post-Hearing Memorandum at 15, Dkt. # 36. According to the plaintiffs (again without citation to the transcript), Rainville attended Local 743 membership meetings and occasionally interrupted Berg in order to contradict him.[7] The plaintiffs note that Hoffa did not assign a personal representative following the 2004 election scandal involving fraud and several Local 743 officials being criminally indicted. Nor did Hoffa assign a personal representative to Local 743 after internal union charges were brought against Chester Glanton.

However, Coli testified that Hoffa has placed personal representatives in several Chicago area local unions in the past several years. Tr. at 398-401. These representatives were placed in the local unions due to, among other things, a "change in the top leadership" as well as a "split

---

[7]Coli testified that as executive director of JC 25, Rainville did not vote or have any input into the decision to find Berg and Alvarez guilty of the internal union charges. Tr. at 401.

board" being voted into office. *Id*. at 400.[8] The plaintiffs have pointed to no evidence that Hoffa's placement of Rainville as a personal representative in Local 743 after Berg and Alvarez, the president and secretary-treasurer, were held liable for internal union violations and were subject to exclusion from membership and office was based on their political views or opposition to the Hoffa administration.[9]

While it is clear that the relationship between TDU and the plaintiffs and the Hoffa supporters has been contentious, the court cannot conclude that the plaintiffs have made a substantial showing of a likelihood of success on the merits with respect to their retaliation claim.

      b.      <u>Due Process</u>

The plaintiffs only superficially address their due process claim and thus the court briefly discusses it. Once again, the court observes that the plaintiffs' discussion of actual legal principles is practically non-existent in this section.

As noted by another court in this district:

> Section 101(a)(5) safeguards union members against improper disciplinary action by providing that: "[n]o member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing."

*Serafinn v. International Broth. of Teamsters, Local Union No. 722*, No. 03 C 9409, 2006 WL 2497794, at *7 (N.D. Ill. Aug. 28, 2006)(citing 29 U.S.C. § 411(a)(5)).

<u>Notice of the specific bylaw violated</u>. According to the plaintiffs, they were not provided due process because the bylaw that Berg and Alvarez were convicted of violating was not the one specified in the charge. As stated by the Supreme Court, § 411(a)(5) requires that charges be "'specific enough to inform the accused member of the offense that he has allegedly committed.'" *International Bhd. of Boilermakers v. Hardeman*, 401 U.S. 233, 245 (1971)(citation omitted). Indeed, the Seventh Circuit has stated that "[r]eference to a specific provision of the union's

---

[8]According to Brian Rainville, JC 25's executive director, "all but one of the 22 locals supported Hoffa's reelection last year." *See* Plaintiffs' Exh. P.

[9]In an apparent effort to weaken the plaintiffs' position that Rainville was a "political spy" who only was placed in Local 743 to undermine the plaintiffs, the defendants point out that a week before Rainville was appointed as Local 743's personal representative, Berg sent him a letter thanking him for his "sincere and patient assistance in helping our Executive Board work together and run effective and efficient meetings." *See* JC 25 Hearing Exh. 9, p. 2.

Page 14

constitution or by-laws is not required to meet the specificity requirement of section 101(a)(5). . . ." *Frye v. United Steelworkers of America*, 767 F.2d 1216 (7th Cir. 1985), superseded by statute on other grounds, *Meyer v. Rigdon*, 36 F.3d 1375, 1380 (7th Cir. 1994).

Here, though the written charge referred to Section 12(A)(2) of the bylaws, it also stated that Berg and Alvarez were charged with violating "all related Sections of Local 743 Bylaws and the IBT Constitution." Moreover, it stated in bold type that "[t]hese payouts [to Caldera] were all done without the approval of the Executive Board." The charge was clear as to the alleged violation and the record shows that Berg and Alvarez understood the charge against them. Their pre-hearing letters to JC 25 Secretary-Treasurer Thomas Steide also refer to the fact that the payments to Caldera had been approved in a phone poll. Moreover, not only did Berg and Alvarez both acknowledge at the preliminary injunction hearing before this court that they understood that they were being charged with paying Caldera $21,000 as a severance payment and 4 months of health benefits without Local 743 board approval, Tr. 43 and 177, but their defense at the JC 25 hearing also reflects their understanding of the charge. *See* JC 25 Exhibit 1, Transcript from JC Hearing, at pp. 89, 93, 96-97 and 121.

Because the charge against Berg and Alvarez was specific enough to inform them of the alleged offense and because the record reflects they understood what the charge was, the plaintiffs have not demonstrated a substantial likelihood of success on this aspect of their due process claim.

<u>JC 25 decision was not signed</u>. The plaintiffs also object to the fact that the JC 25 decision was not signed and there is no written record of who voted. In their reply, the plaintiffs' entire analysis of the issue is as follows:

> The absence of records identifying the judges by name, as well as how they voted are essential records needed to make objections to any judge, such as Coli, who should have recused himself from participating in the GEB deliberations; to make any other objections based on conflict of interest, self-dealing, bias, or other grounds; and to obtain confirmation of compliance with the majority rule vote.

Reply at 13, Dkt. # 47. The plaintiffs' argument must fail as they have cited to no authority whatsoever in support of their claim that the lack of signatures or a "written record of who voted" violates due process. As the defendants note, Section 411(a)(5) does not require signatures or a written record of who voted and how.

To the extent that the plaintiffs object to Coli's involvement, they again cite to no authority in support of this aspect of their claim. While Coli moderated the JC 25 on the charges against Berg and Alvarez, he did not vote. "Charges that bias has undermined the fairness of a disciplinary proceeding must be supported by specific factual allegations from which the operation of bias can be inferred." *Frye*, 767 at 1225. The plaintiffs have failed to do so and the court simply will not construct the plaintiffs' legal arguments for them. *See United States v. Alden*, 527 F.3d 653, 664 (7th Cir. 2008) ("it is not the obligation of this Court to research and

Page 15

construct the legal arguments available to parties."); *Doherty v. City of Chicago*, 75 F.3d 318, 324 (7th Cir. 1996) ("Given our adversary system of litigation, it is not the role of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel.") (citation omitted).

To the extent that the defendants address a potential due process argument based on JC 25's purported bias or whether the plaintiffs received a full and fair disciplinary hearing supported by "some evidence," the court will not consider these arguments (or any others) as it does not appear that the plaintiffs intended to assert them.

    2.    *Other factors*

With respect to the other factors, the plaintiffs must show that they are likely to suffer irreparable harm without the injunction, that the harm they would suffer is greater than the harm that the preliminary injunction would inflict on the defendants, and that the injunction is in the public interest. The plaintiffs have failed to do so. First, the plaintiffs fail to state they do not have a post-election remedy and thus that their harm is irreparable. Moreover, although the plaintiffs may suffer harm by not being allowed to participate in the upcoming election, they have not shown that this harm is greater than the harm suffered by Local 743 in having to place individuals on the ballot who have been found guilty of violating its bylaws. Finally, the plaintiffs have not demonstrated that the requested injunction is in the public interest.

**C.    Conclusion**

Because the court concludes that the plaintiffs have failed to meet their threshold burden for obtaining a preliminary injunction, their motion for a preliminary injunction [5-1] is denied. The plaintiffs' motion for leave to file their reply instanter [47-1] is granted. The plaintiffs' motion to permit filing of a response to the defendants' emergency motion to reconsider the modified briefing schedule [50-1] is denied as moot.

**ENTER:**

**DATE:** October 15, 2010                        */s/ Blanche M. Manning*
                                               **Blanche M. Manning**
                                               **United States District Judge**